PCS Phosphate Co. v. Jacobs Eng'g Grp., Inc., 2026 NCBC 15.

STATE OF NORTH CAROLINA

BEAUFORT COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV000227-060

PCS PHOSPHATE COMPANY, INC.
and PCS ADMINISTRATION (USA),
INC.,

Plaintiffs,

v.

JACOBS ENGINEERING GROUP,
INC. and BUSS CHEMTECH AG,

Defendants.

**ORDER AND OPINION ON
DEFENDANT BUSS CHEMTECH AG'S
MOTION TO TRANSFER OR, IN THE
ALTERNATIVE, DISMISS**

1.     This matter is before the Court on defendant Buss ChemTech AG's motion to transfer or, in the alternative, dismiss the Amended Complaint of plaintiffs PCS Phosphate Company, Inc. and PCS Administration (USA), Inc. (ECF No. 50).

2.     Invoking Rule 12(b)(3) of the North Carolina Rules of Civil Procedure and N.C. Gen. Stat. § 7A-258, Buss argues that the Court should transfer this state-court action to federal court in the United States District Court for the Southern District of New York. Alternatively, Buss moves for dismissal under Rule 12(b)(6), contending that Plaintiffs have failed to state a claim for several of their causes of action alleged in their amended complaint. (ECF No. 50).

3.     With this Order and Opinion, the Court addresses only Buss's requests to transfer, stay, or dismiss this action under Rule 12(b)(3), N.C. Gen. Stat. § 7A-258,[1]

---

[1] Buss's motion and briefing mention § 7A-258 only once each in passing, purely for the procedural components of that statute and with no related substantive analysis. (ECF Nos. 50 at 1 and 51 at 1). Accordingly, the Court need not and does not address it further.

and the doctrine of forum non conveniens. The Court will address Buss's Rule 12(b)(6) arguments in a separate forthcoming Order and Opinion.

4.    The Court previously held a hearing on the motion, and all parties were represented at the hearing by their respective counsel of record. (ECF No. 76). The parties have fully briefed the motion, and the motion is ripe for resolution.

5.    Having considered the amended complaint, the motion, the written and oral arguments of counsel, and applicable law, the Court hereby **DENIES** Buss's motion to the extent it seeks to transfer, stay, or otherwise dismiss this action pursuant to Rule 12(b)(3) or the doctrine of forum non conveniens.

> *Brooks Pierce McLendon, Humphrey & Leonard, LLP by Joseph A. Ponzi, Harold Bolick, Christopher B. Dodd, and Gabrielle E. Supak, and King & Spalding, LLP by Adam Gray for Plaintiffs PCS Phosphate Company, Inc. and PCS Administration (USA), Inc.*
>
> *K&L Gates, by Nathan A. Huff, Lindsay S. Bishop, Jason L. Richey, Justin N. Leonelli, John L. Gavin, and Daniel McClurg for Defendant Jacobs Engineering Group, Inc.*
>
> *Mullins Duncan Harrell & Russell, PLLC by Allison Mullins, Alan W. Duncan, and Tyler Nullmeyer for Defendant Buss ChemTech AG.*

Houston, Judge.

## I.    BACKGROUND

6.    Plaintiffs PCS Phosphate Company, Inc. and PCS Administration (USA), Inc. are Delaware corporations maintaining their principal places of business in North Carolina. (ECF No. 42, ¶ 3). PCS Phosphate "produces products for use as ingredients in fertilizers, livestock and poultry feed, and industrial applications" at its Aurora, North Carolina facility. (ECF No. 42, ¶ 9).

7.    Defendant Buss ChemTech AG is a Swiss corporation and maintains its principal place of business in Switzerland. (ECF No. 42, ¶ 5). Buss "develop[s] and licens[es] chemical process technologies worldwide." (ECF No. 42, ¶ 25).

8.    Plaintiffs[2] have commissioned the construction of an anhydrous hydrogen fluoride plant (the "**AHF Plant**") in Aurora, Beaufort County, North Carolina. (ECF No. 42, ¶¶ 1, 25, 41). Beginning at least by July 2019, PCS Phosphate and Buss began negotiations regarding Buss's potential involvement in the AHF Plant project. (ECF No. 42, ¶¶ 27–28).

9.    In September 2019, PCS Phosphate and Buss finalized their negotiations and entered into an Engineering, Procurement and Field Support Agreement (ECF No. 42.2),[3] outlining Buss's specific role in construction of the AHF Plant. Buss agreed to provide engineering services, materials needed to incorporate Buss's chemical process system and technologies into the AHF Plant, and training and oversight. (ECF No. 42, ¶¶ 1, 25, 41; ECF No. 42.2, Ex. A, §§ 17–17.3.3, 18.1, 18.2 & Ex. B, §§ 19.1, 19.2.1–19.2.4). That agreement ultimately contemplated that the AHF Plant would produce at least 40,000 metric tons per year ("**MTPY**") of anhydrous hydrogen fluoride ("**AHF**"), using two separate lines producing 20,000 MTPY each. (ECF No. 42.2, Ex. A, § 14; ECF No. 42.2, Ex. C, § A(1)).

---

[2] Throughout their amended complaint, Plaintiffs engage in "group pleading," lumping the two PCS entities together in the defined term "PCS" and rarely (but sometimes) specifying the particular entity at issue. *See Britcher v. Assur. Grp., LLC*, 2025 NCBC LEXIS 150, at *10–12 (N.C. Super. Ct. Nov. 4, 2025) (requiring re-pleading in light of improper "group pleading"); *Baker v. Hobart Fin. Grp.*, 2023 NCBC LEXIS 45, at *4–5, 9–10 (N.C. Super. Ct. Mar. 22, 2023) (same). Thus, the amended complaint is often unclear as to the specific entity at issue.

[3] The agreement is attached and incorporated into the complaint as an exhibit.

10.    Under the agreement, the parties agreed that the AHF Plant would be "designed, constructed, erected, and commissioned based on the Engineering Documents and under the technical assistance provided by" Buss. (ECF No. 42.2, Ex. C, § B(1)).

11.    PCS Phosphate and Buss agreed that Buss would provide "Services" that were defined to include:

> all personnel, supervision, services, materials and supplies and do all things necessary for the engineering, design, delivery and procurement of the Proprietary Equipment, testing and commissioning of the Plant (as hereafter defined) as set forth in this Agreement and the other Contract Documents.

(ECF No. 42.2, § 1). Proprietary Equipment was defined to include "any *Equipment* to which [Buss] owns or licenses the exclusive intellectual property rights and which is to be delivered by [Buss] pursuant to the Contract Documents,"[4] with "Equipment" circularly defined as "all *equipment and materials* (by way of example, including the Proprietary Equipment) to be procured, supplied, designed and/or specified, by [Buss] as required by the Contract Documents." (ECF No. 42.2, § 26(e), § 26(m) (emphasis added)).

12.    The parties also agreed that Buss would "furnish efficient administration and management of the design, contract administration and other aspects of the Services" as defined in the agreement. (ECF No 42.2, § 2(a)(iv)). This included, among

---

[4] While Buss emphasizes in its briefing that the definition of "Proprietary Equipment" contains a reference to "intellectual property rights," (ECF No. 51 at 15), the phrase merely describes the category of equipment (i.e., equipment to which Buss otherwise owns the intellectual property rights). It does *not* limit the definition of "Proprietary Equipment" to intangible intellectual property.

other things, ensuring that the Services were performed in compliance with applicable law and the "requirements of applicable permits for the Plant" and furnishing "all of the equipment, computers and labor required to complete the Services. (ECF No 42.2, §§ 2(a)(i) and 2(a)(vi)).

13. In detailing the scope of Buss's work and services, the agreement attaches an exhibit titled "Quotation No 3.20.2 0338," which sets out the "design" of the AHF Plant and the technical specifications for Buss's Services. (ECF No 42, ¶¶ 28–29; ECF No 42.2, § 12 & Ex. A at 14, 25–59).

14. The parties agreed that Buss's "services and supply" (i.e., scope of work) "comprise basically:" (i) an "Extended Basic Engineering package," (ii) "[t]he right to use [Buss's] process technology," (iii) "[d]*esign, procurement and supply of the Materials (as per § 17),*" (iv) "[a]ssistance during *installation of the Materials at Site,*" and (v) "[a]ssistance during commissioning, start-up and performance tests of the Plant." (ECF No. 42.2, Ex. A, § 5.1 (emphasis added)). The term "Materials" is defined to mean "the proprietary equipment and other material to be supplied by" Buss. (ECF No. 42.2, Ex. A, § 2).

15. Among the materials and equipment to be provided with its Services, Buss agreed to provide for installation at the AHF Plant numerous industrial-sized spraying devices, agitators, filters, slurry tanks, and slurry pumps to be assembled and incorporated into the AHF Plant. (ECF No. 42.2, Ex. A, §§ 17.1.1, 17.1.2, and 17.1.3; ECF No. 42.2, Ex. B, § 1.1).

16. Buss also proposed to "offer spare parts for the Materials as an option" under the agreement. (ECF No. 42.2, Ex. A, §§ 17.4).

17. To provide the services and materials and to install the equipment at issue, Buss agreed to provide a team of up to five engineers and specialists on site[5] for the construction of the AHF Plant, estimating that "[b]ased on Contractor's [i.e., Buss's] experience the period for erection, commissioning, start-up and carry-out the performance test runs of the Plant is expected to an average term of 12 to 15 months." (ECF No. 42.2, Ex. A, § 18.1 (syntax and spelling in original)).

18. Buss agreed that its services would be provided in approximately four phases, consisting of (i) "[b]asic engineering for [PCS Phosphate's] internal AFE cost estimate," (ii) "[c]ompletion of basic engineering package and implementation of changes requested by the HAZOP review meeting," (iii) "Delivery of the Materials," and (iv) the provision of "Field Services." (ECF No. 42.2, Ex. B, § 17).

19. Buss agreed and anticipated that its on-site engineers and specialists would provide "field services" for a up to "267 man-days," with at least ten round-trip visits to the AHF Plant. (ECF No. 42.2, Ex. A, § 18.1). The services to be provided under the agreement include, among other things, training PCS Phosphate's personnel on-site in the AHF Plant; supervising the erection of construction materials; inspecting the erection process; checking to confirm mechanical completion; overseeing the testing performed by PCS Phosphate's operating personnel of the mechanical,

---

[5] "Site" is defined by the agreement as "the real property owned by PCS Phosphate in or near Aurora, North Carolina, upon which the Plant is to be constructed, erected and operated, and including, without limitation, any laydown and similar areas dedicated for use in connection with the Plant construction." (ECF No. 42.2, § 26(o)).

functional, start-up, and performance of materials on site; training on site; and providing multiple engineers to complete the process. (ECF No. 42.2, Ex. A, §§ 18.1, 18.2 & Ex. B, §§ 19.1, 19.2.1–19.2.4).

20. Buss also agreed to provide, at PCS Phosphate's request, "key-specialists" to "ensure the integration of the Plant in the Site" (i.e., to ensure that the AHF Plant was properly integrated into the overall physical site). These services included, at PCS Phosphate's request, "electrical, piping, instrumentation, program of the DSC and safety design activities relating to all field tie-ins (interface connections). (ECF No. 42.2, Ex. B, § 19.3).

21. Buss further agreed that its "Standard of Care" under the agreement would be, in relevant part, "those standards of care and diligence normally practiced by engineering *and construction firms* in the performance of design, procurement, *construction*, commissioning and testing services for a anhydrous hydrofluoric acid production facility as of the Effective Date." (ECF No. 42.2, § 26(p) (emphasis added); ECF No. 42.2, § 2(a)(ii) ("All Services provided by Engineer hereunder shall be . . . in accordance with the Standard of Care . . .")). The parties also agreed that Buss would "exercise the Standard of Care to minimize Plant downtime and reduced Plant operations and production, including utilizing reasonable overtime and expedited *equipment, machinery, parts, and materials deliveries.*" (ECF No. 42.2, § 2(b) (emphasis added)).

22. The parties also agreed that the AHF "Plant shall be designed, constructed, erected, commissioned and started-up in close cooperation between [PCS Phosphate]

and [Buss]." (ECF No. 42.2, Ex. A, § 3.1).

23. At its core, the agreement provided that Buss would (i) design parts of the AHF Plant as relevant to integration of Buss's equipment and technology, (ii) provide the equipment and materials necessary to produce or manufacture AHF from fluorosilicic acid, (iii) provide on-site installation assistance for its equipment in the AHF Plant, and (iv) oversee, and assist PCS Phosphate in completing, the initial installation, start-up, and testing phases of the manufacturing process within the AHF Plant. (*See generally* ECF No. 42.2).

24. In the event of a dispute between the parties, the contract contains two substantively similar forum-selection and choice-of-law clauses providing, in relevant part, as follows:

> **21. DISPUTE RESOLUTION**
>
> . . .
>
> > **(b) Litigation**. . . . Any litigation by the parties over any Dispute under this Agreement shall be governed by New York law. All disputes arising out of or in connection with this Agreement shall be finally settled in the State of New York or the United States District Court for the Southern District of New York. The language shall be English.
>
> . . .
>
> **29. GOVERNING LAW**
>
> This Agreement shall be governed by New York law. All disputes arising out of or in connection with this Agreement shall be finally settled in State of New York or the United States District Court for the Southern District of New York. The language shall be English.

(ECF No. 42.2, §§ 21(b) and 29 – together, the "**Clauses**").[6]

25.     Plaintiffs allege that, since the relationship commenced, Buss has breached the agreement in myriad ways. (ECF No. 42, ¶¶ 35–49).

26.     Thus, Plaintiffs filed their original complaint on 28 February 2025, followed by an amended complaint on 20 June 2025. (ECF Nos. 3 and 42).

27.     As against Buss, Plaintiffs assert causes of action for breach of contract, breach of warranty, negligent misrepresentation, and professional negligence. (ECF No. 42, ¶¶ 50–80).

28.     The case was designated as a mandatory complex business case on 7 April 2025 and was ultimately reassigned to the undersigned judge on 21 August 2025. (ECF Nos. 1 and 66).

29.     On 21 July 2025, Buss filed a motion to transfer, or in the alternative, dismiss. (ECF No. 50). The Court thereafter held a hearing at which counsel for all parties appeared, (ECF No. 76), and the motion is ripe for resolution.[7]

---

[6] Though worded differently, the provisions are functionally the same. The parties' arguments are premised largely on the phrasing from § 29, and the Court therefore primarily references that section of the agreement. The result, however, remains the same regardless of the provision at issue.

[7] Though Buss submitted an affidavit and various purported draft documents and communications with its response brief to argue that the parties negotiated the application of New York law and New York as a neutral venue, (ECF Nos. 52.1–52.11), the plain language of the final agreement is unambiguous, and the Court need not resort to extrinsic evidence regarding the parties' intent with respect to whether the agreement is and was one for improvements, or the provision of materials for improvements, in North Carolina. *Galloway v. Snell*, 384 N.C. 285, 287–88 (2023) (citation omitted). Indeed, the provisions of N.C. Gen. Stat. § 22B–2 apply based on the facial subject matter of the underlying contract to which the parties agreed—not the work subsequently performed or not performed under the contract. *See generally* N.C. Gen. Stat. § 22B–2. Thus, for purposes analyzing the application of § 22B–2, Buss's contention that it did not ultimately perform, or have the opportunity to perform, much of the work for which it contracted is simply irrelevant to the issue presently before the Court. (ECF No. 52.1, ¶¶ 9–14).

## II.  ANALYSIS

30.  Buss argues that this Court is not a proper venue for this action and therefore requests that the Court transfer the matter to the Southern District of New York or dismiss the action with leave to refile in that federal district pursuant to Rule 12(b)(3) of the North Carolina Rules of Civil Procedure.[8] (ECF No. 51 at 8–17; ECF No. 75 at 1–6). Alternatively, Buss contends that the Court should transfer (or dismiss without prejudice and allow it to refile) this action under the doctrine of forum non conveniens. (ECF No. 51 at 17–19; ECF No. 75 at 6–8). The Court addresses each argument in turn.

31.  In opposition, Plaintiffs contend that this state-court action may not be "transferred" to the federal court system,[9] that the Clauses are void and unenforceable under N.C. Gen. Stat. § 22B–2 because the PCS Phosphate-Buss Agreement is for the improvement of real property or the provision of materials for

---

[8] Regardless of whether the motion is styled as a motion to "dismiss" or to "transfer," the Court's resolution of the motion is ultimately the same to the extent the motion is filed pursuant to Rule 12(b)(3). *Coats v. Sampson Cnty. Mem'l Hosp., Inc.*, 264 N.C. 332, 334 (1965) (citation omitted).

[9] The Court agrees. While transfer is the appropriate mechanism under Rule 12(b)(3) to move an action from one North Carolina judicial district to another, *Aldridge v. Kiger*, 2016 NCBC LEXIS 85, at *4 (N.C. Super. Ct. Nov. 3, 2016), dismissal without prejudice is the appropriate mechanism under Rule 12(b)(3) to move an action from North Carolina state court to another state or federal court. *E.g., Big League Analysis, LLC v. Off. of the Comm'r of Baseball*, 2016 NCBC LEXIS 68, at *24, 29 (N.C. Super. Ct. Aug. 29, 2016); *Wall v. Automoney, Inc.*, 284 N.C. App. 514, 533 (2022), *appeal docketed* 249P22 (N.C. Feb. 18, 2026). Federal courts have been abundantly clear that "federal courts, alone, have authority to transfer venue to a federal court in a different state." *FindWhere Holdings, Inc. v. Sys. Env't Optimization, LLC*, 626 F.3d 752, 754 (4th Cir. 2010); *Montero v. Tulsa Airport Improvements Tr.*, 770 F. App'x 439, 440 (10th Cir. 2019) (unpublished) ("Section 1404(a) . . . does not allow a state court to transfer a case to federal court." (citations omitted)); *Kosachuk v. 9197-5904 Que., Inc.* 2025 U.S. Dist. LEXIS 120080, at *11 n.1 (S.D.N.Y. June 25, 2025) ("This of course makes no sense, as a state court cannot remand (or 'transfer') a case to a federal court in a different state." (citing 28 U.S.C. § 1441)).

such an improvement, and that North Carolina is otherwise the most convenient forum for litigation of this dispute. (ECF No. 60). The Court address the arguments in turn.

### A. <u>Buss's Rule 12(b)(3) Motion</u>

32. "In North Carolina, the proper procedure for seeking enforcement of a contractual forum or venue selection clause is a motion to dismiss for improper venue pursuant to Rule 12(b)(3)." *LendingTree, LLC v. Anderson*, 2012 NCBC LEXIS 21, at *5 (N.C. Super. Ct. Apr. 11, 2012) (citing *Hickox v. R&G Group Int'l, Inc.*, 161 N.C. App. 510, 511 (2003)); *Albright v. Vining-Sparks Sec., Inc.*, 2019 NCBC LEXIS 115, at *11 (N.C. Super. Ct. Dec. 31, 2019) ("Rule 12(b)(3) motion is the proper method by which to seek enforcement of an exclusive forum selection clause.")

33. Generally, North Carolina courts will "enforce a contractual forum selection clause if that clause is mandatory." *Apex Tool Grp., LLC v. Ingersoll-Rand Co.*, 2013 NCBC LEXIS 24, at *5 (N.C. Super. Ct. May 14, 2013) (citations omitted); *see also Earnhardt Plumbing, LLC v. Thomas Builders, Inc.*, – N.C. App. – , 2025 N.C. App. LEXIS 815, at *21 (Nov. 19, 2025) (determining trial court "erred in concluding the forum-selection clause was not enforceable").

34. However, even a mandatory forum-selection or choice-of-law clause may be unenforceable under certain circumstances. *E.g.*, N.C. Gen. Stat. §§ 22B–1, 22B–2, 22B–3; *Wall*, 284 N.C. App. at 532–33 (citations omitted) (determining a forum selection clause was "unenforceable as against public policy" under N.C. Gen. Stat. § 22B–3 and also unenforceable under North Carolina usury law); *Sony Ericsson*

*Mobile Communs. United States v. Agere Sys.*, 195 N.C. App. 577, 581–82 (2009) (determining trial court correctly concluded that a forum selection clause was an unenforceable agreement to agree).

35.     Most relevant to this action, under North Carolina law,

> A provision in any contract, subcontract, or purchase order for the *improvement of real property* in this State, *or the providing of materials therefor*, is void and against public policy if it makes the contract, subcontract, or purchase order subject to the laws of another state, or provides that the exclusive forum for any litigation, arbitration, or other dispute resolution process is located in another state.

N.C. Gen. Stat. § 22B–2 (emphasis added).

36.     As set forth above, the Clauses here purport to make the agreement subject to New York law (i.e., "governed by New York law") and to require all disputes to be resolved in forums exclusively in the State of New York (i.e., "in the State of New York or the United States District Court for the Southern District of New York"). (ECF No. 42.2, § 29; *see* ECF No. 42.2, §21(b)).

37.     However, the PCS Phosphate-Buss agreement contemplates that services, materials, and the work to be provided under the agreement will be provided or otherwise performed largely in North Carolina, with field services and at least "267 man-days" to be completed over numerous round-trip visits to the site of the AHF Plant in North Carolina. (ECF No. 42.2, Ex. A, § 18.1, 18.2 & Ex. B, §§ 19.1, 19.2.1–19.2.4).

38.     Thus, the Clauses are "void and against public policy" if the PCS Phosphate-Buss agreement is a contract for either (i) "the improvement of real property" in North

Carolina or (ii) "the providing of materials" for the improvement of real property in North Carolina. N.C. Gen. Stat. § 22B–2.

39. The terms "improvement" and "materials" are undefined in N.C. Gen. Stat. § 22B–2.

40. In such situations, "[u]ndefined words are accorded their plain meaning so long as it is reasonable to do so," and, in determining a word's plain meaning, North Carolina courts have "'used standard, nonlegal dictionaries as a guide.'" *Midrex Techs., Inc. v. N.C. Dep't of Revenue*, 369 N.C. 250, 258 (2016) (citations and internal punctuation omitted); *Surgical Care Affiliates, LLC v. N.C. Indus. Comm'n*, 256 N.C. App. 614, 621 (2017) ("When a statute employs a term without redefining it, the accepted method of determining the word's plain meaning is not to look at how other statutes or regulations have used or defined the term—but to simply consult a dictionary." (citation omitted)).

41. The common meaning of the term "material" or "materials" is "the elements, constituents, or substances of which something is composed or can be made" or the "apparatus necessary for doing or making something." *Material, Merriam-Webster*, https://www.merriam-webster.com/dictionary/materials (last visited Feb. 17, 2026); *Materials, Merriam-Webster*, https://www.dictionary.com/browse/materials (last visited Feb. 17, 2026) (defining the term as "the equipment necessary for a particular activity").

42. The ordinary meaning of the term "improvement" is (i) "the act or process of improvement" or (ii) "the state of being improved." *Improvement, Merriam-Webster*,

https://www.merriam-webster.com/dictionary/improvement (last visited Feb. 17, 2026); *Improvement, Dictionary.com*, https://www.dictionary.com/browse/improvement (last visited Feb. 15, 2026) ("an act of improvement or the state of being improved" or "a change or addition by which a thing is improved").

43. In turn, the term "improve" generally means (i) "to enhance in value or quality: make better," (ii) "to increase the value of (land or property) by making it more useful for humans (as by cultivation or the erection of buildings)," and (iii) "to make useful additions or amendments." *Improve, Merriam-Webster*, https://www.merriam-webster.com/dictionary/improve (last visited Feb. 17, 2026); *Improve, Dictionary.com*, https://www.dictionary.com/browse/improve (last visited Feb. 17, 2026) (defining "improve" as "to make (land) more useful, profitable, or valuable by enclosure, cultivation, etc.").

44. Moreover, this common (and broad) meaning aligns with the definitions of "improve" and "improving" used in statutory schemes related to § 22B–2. For example, N.C. Gen. Stat. § 22C–1, which addresses payments to subcontractors in the construction context specifically, defines the term "[i]mprove" as

> to build, effect, alter, repair, or demolish any improvement upon, connected with, or on or beneath the surface of any real property, or to excavate, clear, grade, fill or landscape any real property, or to construct driveways and private roadways, or to furnish materials, including trees and shrubbery, for any of such purposes, or to perform any labor upon such improvements, and shall also mean and include any design or other professional or skilled services furnished by architects, engineers, land surveyors and landscape architects registered under Chapters 83A, 89C or 89A of the General Statutes.

N.C. Gen. Stat. § 22C–1(2).

45.    The same statute defines the term "[i]mprovement" to mean "all or any part of any building, structure, erection, alteration, demolition, excavation, clearing, grading, filling, or landscaping, including trees and shrubbery, driveways, and private roadways, on real property." N.C. Gen. Stat. § 22C–1(3); N.C. Gen. Stat. § 44A–7(3) and –7(4) (similar definitions in the statutory lien context).

46.    While these statutory definitions are not binding in the context of the Court's analysis of § 22B–2, they reflect that, even in other statutory schemes, the concept of an improvement is, in essence, to provide materials or services for the benefit or betterment of real property or natural or man-made structures and fixtures thereon. *Taveney v. Int'l Paper Co.*, 2022 U.S. Dist. LEXIS 55637, at *12–13, 17 (E.D.N.C. Mar. 28, 2022) (using §§ 22C-1 and 44A-7 to evaluate the term "improvement" under § 22B–2 and determining that "repairing the valves at International Paper's mill, as contemplated in the parties' contract, constitute[d] an improvement to real property").

47.    As Buss argues, the limited case law analyzing § 22B–2 has most commonly been in the "traditional construction context." (ECF No. 51 at 14); *e.g.*, *T.M.C.S., Inc. v. Marco Contrs.*, 244 N.C. App. 330, 331, 334 (2015) (applying § 22B–2 to "a construction contract for the renovation of a Wal-Mart, Inc. ('Wal-Mart') retail store."); *DFA Dairy Brands, LLC v. Primus Builders, Inc.*, 2021 U.S. Dist. LEXIS 154452, at *10–11 (W.D.N.C. July 27, 2021) (citations omitted) ("The mandate of N.C. Gen. Stat. § 22B–2 is clear. Out-of-state contractors cannot venture into North Carolina to perform construction work on North Carolina real property and seek the

application of another jurisdiction's law."); *Taveney*, 2022 U.S. Dist. LEXIS 55637, at *12–13, 17; *see also Front Street Const., LLC v. Colonial Bank, N.A.*, 2012 NCBC LEXIS 25, at *34 n.61 (N.C. Super. Ct. May 11, 2012) (declining to apply § 22B–2 to a loan agreement); *Wake Cnty. Bd. of Educ. v. Dow Roofing Sys., LLC*, 792 F. Supp. 2d 897, 899, 901–02 (E.D.N.C. 2011) (finding that § 22B–2 did not apply in a product warranty case governed by the Federal Arbitration Act).

48.     However, despite Buss's assertions to the contrary, neither the explicit language of the statute nor case law limits § 22B–2 to the "traditional construction context." (*Compare* ECF No. 51 at 14 (arguing that the statute "does not apply to contracts . . . outside of the traditional construction context")), *with* N.C. Gen. Stat. § 22B–2 (containing no such limitation) *and Taveney*, 2022 U.S. Dist. LEXIS 55637, at *12–13, 17 (applying the statute in the context of repairs to mechanical valves rather than the traditional context of horizontal or vertical construction).

49.     Rather, the statute merely requires that the subject matter of the contract be for the improvement of real property or the providing of materials for such improvements. N.C. Gen. Stat. § 22B–2; *T.M.C.S., Inc.*, 244 N.C. App. at 334; *compare Colonial Bank*, 2012 NCBC LEXIS 25, at *34 n.61 (determining that the subject matter of a contract was financial distributions rather than improvements) *and Dow Roofing Sys.*, 792 F. Supp. 2d at 899, 901–02 (concluding that the subject matter of a contract was a product warranty rather than improvements), *with Taveney*, 2022 U.S. Dist. LEXIS 55637, at *12–13, 17 (determining that the subject matter of contract was the replacement of valves in an already-completed construction, with the

replacement constituting an "improvement" under § 22B–2).

50.     Accordingly, the Court declines Buss's invitation to limit § 22B–2 to the "traditional construction context" and instead applies the plain language of the statute to the contract and Clauses at issue.[10]

51.     Plaintiffs contend that the agreement with Buss is one for "improving real property" or providing materials for such an improvement and that the Clauses should be invalidated under § 22B–2. (ECF No. 60 at 5–13). Conversely, Buss contends that the agreement is, at its core, a licensing agreement and not a "traditional construction contract," as it asserts is required under § 22B–2. (ECF No. 51 at 6–17).

52.     Ultimately, the Court concludes that the PCS Phosphate-Buss agreement is subject to § 22B–2 and that the Clauses at issue are therefore void and unenforceable part of the agreement.

53.     Buss agreed to provide, among other things:

    a.      "all personnel, supervision, services, materials and supplies and do all things necessary for the engineering, design, delivery and procurement of the Proprietary Equipment, testing and commissioning of the Plant," as necessary to improve the AHF Plant and to permit the AHF Plant, in turn, to

---

[10] Even if the Court were to adopt Buss's argument and limit the statute to the traditional construction context, other statutes (including § 22B–1) have defined the phrase "construction agreement" to broadly include "[a]ny promise or agreement in, or in connection with, a contract or agreement *relative to the design, planning*, construction, *alteration*, repair, or maintenance of a *building, structure*, highway, road, appurtenance, or appliance, including moving, demolition, and excavating connected therewith." N.C. Gen. Stat. § 22B-1(f)(1) (emphasis added). Such a broad definition would certainly include the agreement at issue in this case.

produce AHF, (ECF No. 42.2, §§ 1, 26(e), and 26(m));

b.  myriad engineering services and an "engineering package" for the improvement of the AHF Plant, (ECF No. 42.2, Ex. B, § 17);

c.  dozens of industrial-sized, mechanical devices (including agitators, filters, slurry tanks, and slurry pumps) for assembly, installation, and near-constant use at the AHF Plant, with those materials being integral to the eventual operation of the AHF Plant, (ECF No. 42.2, Ex. A, §§ 17.1.1, 17.1.2, and 17.1.3; ECF No. 42.2, Ex. B, § 1.1);

d.  "[d]esign, procurement and *supply of the Materials*" and "Delivery of the Materials" needed to enable the AHF Plant to operate, (ECF No. 42.2, Ex. A, § 5.1 (emphasis added); ECF No. 42.2, Ex. B, § 17);

e.  "[a]ssistance during *installation of the Materials at Site*," (ECF No. 42.2, Ex. A, § 5.1 (emphasis added));

f.  at PCS Phosphate's request, "electrical, piping, instrumentation, program of the DSC and safety design activities relating to all field tie-ins (interface connections)," (ECF No. 42.2, Ex. B, § 19.3); and

g.  on-site manpower to supervise construction, inspections of the construction and erection process, oversight of system testing, and on-site training, (ECF No. 42.2, Ex. A, §§ 18.1, 18.2 & Ex. B, §§ 19.1, 19.2.1–19.2.4).

54.  Considering the common meaning of the terms "materials" and "improvement," it is apparent that the agreement between PCS Phosphate and Buss was one for at least the provision of materials (i.e., Buss's plant-wide chemical process

system and related components) to be incorporated, installed, and ultimately used as part of the eventual AHF Plant facility constructed on the site (i.e., improvement of the site). N.C. Gen. Stat. § 22B–2; *see, e.g.*, *Taveney*, 2022 U.S. Dist. LEXIS 55637, at *12–17.

55.   Whether as a contract for improvements or for the delivery of materials for improvements, the agreement falls within the purview of N.C. Gen. Stat. § 22B–2.

56.   Accordingly, the Clauses contained in § 21(b) and § 29 of the agreement are void and unenforceable under N.C. Gen. Stat. § 22B–2 and do not provide a valid basis upon which Buss may seek to have this action transferred or New York law applied to this dispute. Thus, the Court **DENIES** Buss's Rule 12(b)(3) motion to the extent it is premised on the validity of the Clauses.

### B. Forum Non Conveniens

57.   As an alternative to enforcing the Clauses, Buss moves to dismiss or transfer this action under the common law doctrine of forum non conveniens,[11] arguing that the United States District Court for the Southern District of New York is a more convenient forum. (ECF No. 51 at 17–19; ECF No. 75 at 6–8).

---

[11] Though Plaintiffs premise much of their argument upon N.C. Gen. Stat. § 1-75.12(a), Buss does not reference the statute in its motion or briefing. (ECF Nos. 50, 51, and 75). Regardless of whether Buss is advancing a "common law" theory or a "statutory" theory with its phrasing, however, the factors the Court considers, and the results, are the same. *Compare Motor Inn Mgmt., Inc. v. Irvin-Fuller Dev. Co., Inc.*, 46 N.C. App. 707, 713 (1980) (addressing elements for forum non conveniens under § 1–75.12(a)), *with Eco Terra Prods., Inc. v. DayStar Holdings, LLC*, 270 N.C. App. 820, 2020 N.C. App. LEXIS 271, at *11–12 (2020) (unpublished) (quoting *Motor Inn Mgmt.*, 46 N.C. App. at 713, and reciting the same elements as being those for "the common-law doctrine of forum non conveniens"); *see also Hengqin Dingsheng Zhirong Equity Inv. Fund Ltd. P'ship v. Li*, 2025 NCBC LEXIS 24, at *14–15 (N.C. Super. Ct. Mar. 5, 2025) (explaining that "North Carolina's General Assembly has codified the doctrine of forum non conveniens" in § 1–75.12(a)).

58. In support of its motion, Buss argues only two primary points: (i) that this Court should decline to exercise jurisdiction based on the Clauses' requirement to apply New York law in a New York forum and (ii) that a North Carolina judgment would be unenforceable in Switzerland because it would be in disregard of what Buss contends to be the valid forum-selection and choice-of-law Clauses. (ECF No. 51 at 17–19; ECF No. 75 at 6–8).

59. Both of these arguments are premised almost entirely on the contention that the Clauses are enforceable. (ECF No. 51 at 17–19; ECF No. 75 at 6–8). However, because the Clauses are *not* enforceable, as set forth above, each argument fails on that basis.

60. Moreover, considering the factors most commonly evaluated in the context of forum non conveniens motions, the factors overwhelmingly favor denial of the motion. Specifically, in evaluating a motion made on the basis of forum non conveniens, courts generally consider

> convenience and access to another forum; nature of case involved; relief sought; applicable law; possibility of jury view; convenience of witnesses; availability of compulsory process to produce witnesses; cost of obtaining attendance of witnesses; relative ease of access to sources of proof; enforceability of judgment; burden of litigating matters not of local concern; desirability of litigating matters of local concern in local courts; choice of forum by plaintiff; all other practical considerations which would make the trial easy, expeditious and inexpensive.

*Motor Inn Mgmt*, 46 N.C. App. at 713.

61. This action concerns the parties' rights, obligations, and performance under a contract to be performed in North Carolina, with respect to services to be provided

in North Carolina, for the AHF Plant being built in North Carolina. (*See generally* ECF Nos. 42 and 42.2).

62. Because § 22B–2 applies, North Carolina law—not New York law—governs the agreement. N.C. Gen. Stat. § 22B–2.

63. New York is not a more convenient or accessible forum than North Carolina. Plaintiffs both maintain their principal places of business in North Carolina, while Buss is based in Switzerland. (ECF No. 42, ¶¶ 3, 5). Under the circumstances, at least two of the three parties at issue would have far less travel as a result of proceeding in North Carolina, while Buss would be litigating between 3,900 and 4,500 miles from its principal place of business in Switzerland regardless of whether the case were to proceed in Beaufort County, North Carolina or the Southern District of New York.[12]

64. As Buss acknowledges, neither Buss nor Plaintiffs have significant ties to New York, and the subject matter of this action has no specific ties to New York. Indeed, Buss contends that the parties selected New York and New York law specifically *because* of the lack of ties to New York. (ECF No. 51 at 4).

65. Buss alleges in conclusory fashion that proceeding in North Carolina would "be an inefficient use of judicial resources, impose additional burdens on witnesses, [and] increase expenses," (ECF No. 51 at 19), but neither side has introduced substantive and competent evidence regarding the witnesses who will appear for

---

[12] *See* N.C. R. Evid. 201; *State v. Cannon*, 254 N.C. App. 794, 797–98 (2017) (citations omitted) (concluding that it is appropriate to take judicial notice of "the geographic distance between cities, the modes of travel between cities, the commercial aspects of their local area," and similar distance and commute-related information).

trial, the locations of those witnesses, or the costs likely to be incurred in connection with their appearance at trial, if applicable.

66. Since the AHF Plant is in Beaufort County, North Carolina, over 500 miles from the Southern District of New York in Manhattan, New York, factors concerning a jury and the ability to conduct a site visit; the ease of access to sources of proof; the desirability of litigating matters of local concern in local courts; and Plaintiffs' choice of forum all weigh in favor of maintaining this as a Beaufort County Superior Court action pending before the North Carolina Business Court. *Motor Inn Mgmt.*, 46 N.C. App. at 713; *Wachovia Bank v. Deutsche Bank Trust Co. Ams.*, 2006 NCBC LEXIS 10, at *18 (N.C. Super. Ct. June 2, 2006) (citation omitted) ("Courts generally give great deference to a plaintiff's choice of forum, and a defendant must satisfy a heavy burden to alter that choice by transferring or staying the case.").

67. With respect to enforceability of any potential judgment in this action, Buss asserts that Swiss courts (like most other courts) will not enforce a judgment entered by a court that lacked jurisdiction and that Swiss law favors the parties' choice of forum in their contracts. (ECF No. 51 at 18–19).[13]

68. Buss has not moved to dismiss this action under Rule 12(b)(1) or Rule 12(b)(2) for lack of subject matter jurisdiction or personal jurisdiction, respectively, and, inasmuch as this Court has determined that the Clauses are void and unenforceable, the Court has no reason to conclude that it lacks jurisdiction over this

---

[13] Of course, North Carolina courts *also* will not enforce judgments from a court that lacked jurisdiction prior to entering its judgment. *E.g.*, *Gardner v. Tallmadge*, 207 N.C. App. 282, 292 (2010) ("[A] court of this state may not enforce a judgment entered by a court of a foreign state that lacked subject matter jurisdiction to enter the judgment[.]").

action or to believe that a Swiss court would determine otherwise. With neither party having substantive ties to the State of New York, it is also unclear on what basis a Swiss court might determine that New York courts have jurisdiction if the Clauses are not otherwise enforceable.

69. Even if Buss were correct, however, that a Swiss court would be unlikely to enforce a North Carolina judgment in this action, that factor is one of many in a forum non conveniens analysis and does not outweigh the factors supporting jurisdiction in North Carolina.

70. The Court also notes that defendant Jacobs Engineering Group, Inc. is a defendant in this action, and purporting to transfer (or dismiss without prejudice) Plaintiffs' causes of action against Buss to permit separate litigation in the Southern District of New York would not dispose of this action as against Jacobs or otherwise be judicially efficient in that it would thereafter result in multiple pending cases.

71. Accordingly, the Court determines that the overwhelming balance of these factors favors denial of Buss's motion in the Court's discretion.

## III. CONCLUSION

72. Therefore, in the exercise of its discretion, the Court **DENIES** Buss's motion to transfer, stay, or otherwise dismiss this action under Rule 12(b)(3), N.C. Gen. Stat. § 7A-258, and the doctrine of forum non conveniens.

**SO ORDERED**, this 19th day of February 2026.

/s/ Matthew T. Houston.
Matthew T. Houston
Special Superior Court Judge
 for Complex Business Cases